The **SOAP AND DETERGENT ASSOCIA-TION, etc., et al., Plaintiffs,**

v.

Stephen P. **CLARK et al., as members and constituting the Board of County Commissioners of Dade County, Florida, et al., Defendants.**

No. 71–639–Civ.

United States District Court,
S. D. Florida.

Sept. 8, 1971.

Smathers & Thompson, Miami, Fla., Pierson, Ball & Dowd, Washington, D. C., Sibley, Giblin, Levenson & Ward, Miami Beach, Fla., Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, Arnold & Porter, Washington, D. C., for plaintiffs.

Stuart Simon, County Atty., Alan T. Dimond, Asst. County Atty., Miami, Fla., for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

CABOT, District Judge.

On March 30, 1971, the Board of County Commissioners of Dade County, Florida, passed Section 24–44 of the Code of Metropolitan Dade County, as adopted by Ordinance No. 71–31, regulating the sale and use of phosphate detergents in the county. In rapid succession, the plaintiffs in this controversy, the Soap and Detergent Association, a 115-member industry group, later joined by the Colgate Palmolive Company, Lever Brothers Company, the Procter & Gamble Company, and the Procter & Gamble Distributing Company, filed a complaint in this court seeking a declaratory judgment holding the above ordinance to be unconstitutional as an unreasonable burden on interstate commerce, under the commerce clause of the United States Constitution, Article I, Section 8, Clause 3: "Congress shall have power to * * * regulate commerce * * * among the several States." The defendants comprise the individual members of the Board of County Commissioners of Dade County, the individual members of the Pollution Control Board of Dade County, and the Pollution Control Officer of Dade County.

At this stage of the suit, the plaintiffs have complied with Section 24–44(3) of the Code, which establishes a present phosphate limit in detergents of 8.7%. However, the plaintiffs now seek a preliminary injunction enjoining the defendants from enforcing Section 24–44(4) of the Code, making it unlawful to sell or use detergents containing any phosphorus on or after January 1, 1972, and Section 24–44(2) of the Code, as amended by Ordinance No. 71–61, requiring that all detergents sold in Dade County on or after January 1, 1972, be labeled to list all ingredients contained

therein and to express the percentages of each ingredient by weight, pending a final hearing and determination of the issues on the merits. Additionally, plaintiffs request a preliminary injunction for a period of four and one-half months after the date of the final determination of the cause by this court, provided the ordinance is ruled constitutional. The four and one-half months period constitutes lead time, which the plaintiffs contend is necessary to manufacture and distribute detergent products to Dade County retailers in compliance with the total phosphate ban and the all-ingredients labeling provisions.

■ The plaintiffs are entitled to the injunctive relief sought only if they can show both that they will suffer irreparable harm if an injunction is not issued and that there is a substantial likelihood they will prevail on the merits at final hearing. District 50, United Mine Workers of America v. International Union, United Mine Workers of America, 1968, 134 U.S.App.D.C. 34, 412 F.2d 165.

To adequately grasp the breadth of the issues presented it is necessary to examine the history of phosphate detergents as well as their present day effect on water quality. Detergents containing phosphates have been marketed nationally for more than 23 years. They are used for an increasingly wide variety of household and industrial cleaning purposes. The annual sales of detergents containing phosphates exceed one billion dollars nationwide and more than 5.5 million dollars in Dade County. Of the total amount of detergents marketed for use in automatic home washing machines, more than 90% contain phosphates. Experts for the detergent industry testified that non-phosphate detergents are not as effective cleaning agents as their phosphate counterparts, and non-phosphate detergents may be more hazardous to children in case of accidental ingestion or contact with their eyes or other sensitive parts of the anatomy.

The announced purpose of the total phosphate detergent ban is the retardation and reduction of the eutrophication of Dade County waters. Eutrophication is "the process of nutrient enrichment of water accompanied by a depletion of oxygen." Environment Reporter, Vol. 2, No. 16, Monograph 9. Cultural eutrophication is the acceleration of the eutrophication of a body of water by reason of discharge into it of man-derived nutrients, particularly phosphorus and nitrogen. A body of water normally has a life span of thousands of years in natural conditions, progressing from its pristine state through stagnant waters, to a swamp and finally to dry land. But the death of the waterway through cultural eutrophication can take place in a fraction of the time required for natural eutrophication. The immediate result of cultural eutrophication is increased production of algae and aquatic plants. Expert testimony brought out by the County revealed that on some waterways in Dade County the amount of algae growth is so heavy that solid objects that would ordinarily sink below the surface of the water are unable to do so and rest on top of the algae growth. In turn, this same blanket of algae covering the water blocks out sunlight normally available and necessary to the growth of aquatic plant life whose principal function is to produce oxygen, and thus deprives the water of the oxygen level essential to the life-support of many freshwater game fish. The increased accumulation of algae also restricts the recreational uses of the County's fresh waters. The Dade County Health Department warns that all inland waters in the County are from a public health standpoint unsafe for swimming. The growth of algae in Dade County's temperate waters is even more significant than in colder climes because the higher the water temperature the greater the rate of algae growth, as well as of all living organisms.

Eutrophication may be controlled by reducing the level of one of the major nutrient elements, necessary for the life of the water body, below the level essential to its life. The nutrient in shortest supply in relation to all the other elements needed to create algae blooms is known as the limiting element. The more prevalent view in the scientific community is that phosphorus is the most likely nutrient for controlling eutrophication because of its comparative abundance in the waters and the more ready means for reducing its input into the waters. Based upon scientific testimony, phosphates are the limiting nutrient in the waters of Biscayne Bay to a wide variety of different species of algae, and may well be a limiting nutrient in the inland waters of Dade County. Therefore, reducing the level of phosphorus in the waters will produce a direct effect on the amount of algae and retard the eutrophication of the waterways. Even assuming that phosphates are not the limiting nutrient in the County's waters, the County's experts are still in agreement that phosphates should be reduced as quickly as possible as an essential first step in controlling accelerated algae growth. It is impracticable to attempt to remove other major nutrients, carbon and nitrogen, from the water. Carbon requirements of algae can normally be satisfied from carbon dioxide in the atmosphere, from the natural carbonate in water, and from bacterial degradation. Similarly, nitrogen can be drawn from the atmosphere by blue-green algae and other types of algae. The logical deduction is that any concerted action to reduce the nutrient level in the waters of the County must of necessity focus on the removal of the only major nutrient substantially controllable by man—phosphorus.

One other important reason for reduction of the phosphorus level in Dade County's waters relates specifically to Biscayne Bay. Expert testimony elicited by the County unveiled the ominous possibility of an outbreak of the Red Tide in Biscayne Bay similar to the one presently affecting the Tampa Bay region. The Red Tide is caused by a marine dinoflagellate, *gymnodium brevis*,

which requires a high degree of phosphates to flourish. Once the Red Tide organism blooms, it secretes a toxin which kills fish and poses other serious health hazards. The only chemical difference between Biscayne Bay and Tampa Bay is that the former has a lower phosphate level than does the latter. Consequently, with the increasing amounts of phosphorus entering Biscayne Bay, the proper conditions for an occurrence of the Red Tide in the Bay will exist. The tendency is for today's scientific forecasts concerning environmental pollution to become frightening reality tomorrow.

Phosphate reduction being the logical starting point for reclamation of the County's surface and underlying water systems, the next question becomes how to retard the flow of phosphorus into the water systems. The Pollution Control Officer of Dade County testified that detergent use alone accounts for approximately 50% to 70% of the total amount of phosphates entering sewage treatment plants in Dade County. Dade County's sewage plants engaging in primary and secondary treatment are presently able to remove only about 30% of such phosphates. Twenty of Dade County's 90 sewage treatment plants do provide tertiary treatment, which insures 90% phosphate removal. However, only about half of the one and one-half million residents of Dade County are connected to a sewage system, the other half relying on individual septic tanks for removal of their waste. As a result of poor local conditions, such as porous rock formation, a high underground water table, and the abundance of inland waterways, the septic tanks release waste waters directly into the fresh waters. Consequently, the ideal solution to phosphate discharge into local waters is to connect all Dade County residents to sewer systems possessing plants capable of tertiary or other advanced methods of treatment capable of virtually complete phosphate elimination. However, a reasonable cost estimate of such a project, as indicated by the Pollution Control Officer, approaches one billion dollars. Obviously, the cost of removing phosphates through improved and extended sewage treatment facilities far exceeds the cost to the soap and detergent manufacturers to remove phosphates from their detergents. Also, the time needed to accomplish the former greatly surpasses the time required to implement the latter.

■ Having placed the phosphate ban ordinance in its proper environmental setting, it is now appropriate to resolve the question of whether the plaintiffs will suffer irreparable harm if the injunction is not issued and if there is a substantial likelihood that plaintiffs will eventually prevail at the trial on the merits. The detergent industry claims both in testimony and memorandum of law that in order to comply with the County ordinance it will have to expend hundreds of thousands of dollars to make the necessary changes in product formulation and to deliver these new products in new and differently labeled containers to Dade County. These large expenditures will be totally wasted if the plaintiffs prevail on the merits of the case, and the ordinance is ruled unconstitutional. Conversely, if the detergent industry chooses to refrain from complying with the ordinance and abandon the Dade County market, the resulting loss in sales and good will to them would run into the millions of dollars. Even though the detergent industry can show financial loss if the effective date of the ordinance is not enjoined, the detergent industry must also show that there is a substantial likelihood the ordinance will later be held unconstitutional.

The focal point of the detergent industry's attack on the constitutionality of the ordinance is that it is an unreasonable burden on interstate commerce and thus violative of the commerce clause of the United States Constitution. The applicable law is presented in Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific Railroad Co., 1968, 393 U.S. 129,

89 S.Ct. 323, 21 L.Ed.2d 289, wherein the Supreme Court held that where there is conflicting testimony as to the public health, safety, or welfare purpose behind a state statute and the only burden on interstate commerce is increased cost to the interstate commerce businessman, then the court should uphold the legislative determination, which is buttressed by a presumption of correctness. The court there refused to place a price tag on the additional safety, health, or welfare resulting from the enactment of the state law and then balance that figure against the cost to the regulated business. Paraphrasing the language of the court, the judicial power cannot be invoked to invalidate the judgment of the County's citizens speaking through their elected representatives as to the price society should pay to promote health and safety in their community. Balancing the uniform agreement of the County's experts that a total ban on phosphates in detergents will substantially improve the quality of the County's waters, against the financial harm to the detergent industry from complying with such a ban, the scales are strongly tipped in favor of the legislative pronouncement by Dade County's Board of County Commissioners.

Similarly, the contested all-ingredients labeling provision of the County ordinance withstands challenge to its constitutionality. This provision appears to be a reasonable exercise of the County's police power to protect its citizens' health, safety, and welfare. The purpose of the labeling requirement is to provide information which would be helpful to a physician and other professionals who might be called upon to treat a person who had ingested or otherwise been injured by detergents. It would also serve as notice to persons who were allergic to certain chemicals to avoid use of the detergent containing the injurious chemicals. Again, the question of safety and health is one for legislative determination, and mere economic injury to an affected industry will not counterbalance the avowed public intent of the local ordinance.

Furthermore, the problem of water pollution is not subject to uniform national regulation, but rather by its very nature lies within the domain of the local units of government. The qualities and characteristics of bodies of water differ from region to region. Although Miami has a high level of phosphorous in its waters, another city may have a low level and public controls not be necessary. In Huron Portland Cement Co. v. City of Detroit, Michigan, 1960, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852, the Supreme Court upheld the constitutionality of a Detroit smoke abatement ordinance which had as its sole aim the elimination of air pollution to protect the health and enhance the cleanliness of the local community. The court recognized that the problem of air pollution is peculiarly a matter of state and local concern.

The challenged Dade County ordinance, though the most restrictive in the country, is nevertheless not just one voice crying in the wilderness. Similar legislation banning phosphorus in detergents has been passed by the State of Florida (Florida Session Laws, Ch. 71–35 (1971) which sets December 31, 1972, as its deadline), New York, and Connecticut, as well as by Chicago, Detroit, and Akron, among others. The soap and detergent industry will be exposed to the same preparation, production, and distribution costs by those states and municipalities as they now would hold Dade County principally responsible for. The reasonable approach is that the plaintiffs' costs are a normal business response to new legislation appearing nationwide to preserve and protect the nation's waters. How can the detergent industry claim irreparable injury resulting from the Dade County ordinance when it will have to comply with similar, though perhaps less restrictive, legislation elsewhere?

With respect to the all-ingredients labeling provision, the Federal Trade

Commission during hearings in April and June of this year proposed labeling regulations which parallel the Dade County provision. Although the proposal may never be adopted or enforced, it nevertheless does represent concern of other authorities, with their collective expertise, toward the necessity of all-ingredients labeling of detergents.

Though the detergent industry objects to the totality of the phosphate ban, it places special emphasis upon the impracticality of the ban as applied to automatic dishwashing detergents. The detergent industry presented testimony that there are no non-phosphate automatic dishwashing detergents on the market which are suitable for use in household automatic dishwashing machines, as well as in certain other limited areas. Sections 24–48 and 24–49 of the Metropolitan Dade County Code provide a remedy for the harshness of just such a situation. These two provisions authorize the County Pollution Control Hearing Board to grant variances and extensions of time for compliance with the requirements of Chapter 24, which includes the ordinance in issue. Where strict compliance with the phosphate ban is impossible or inappropriate because there is "no technically feasible, economically reasonable means of compliance" to the persons involved, *i. e.*, manufacturers and users of dishwashing detergents and other specialty items, then the Board may operate as a safety valve and add flexibility to the ordinance.

The conclusion of this court is that the plaintiffs are not entitled to a preliminary injunction. The plaintiffs have not satisfied their burden of demonstrating that the Dade County ordinance regulating the content and packaging of detergents is substantially likely to be declared unconstitutional at final hearing. In fact, based on the record here made, it appears that the ordinance in all aspects will withstand constitutional challenge.

The bold action taken by the Board of County Commissioners of Dade County in seeking to revitalize and rescue our troubled waters stands out as a major response to the citizens' overriding concern with environmental pollution. This court would not inhibit such a movement.

Accordingly, it is ordered and adjudged that plaintiffs' application for preliminary injunction be and the same is hereby denied.