The **SOAP AND DETERGENT ASSOCI-ATION**, a Delaware corporation, et al., Plaintiffs,

v.

The **CITY OF CHICAGO**, a municipal corporation of Illinois, Defendant.

**No. 71 C 1054.**

United States District Court, N. D. Illinois, E. D.

March 6, 1973.

phates are made and phosphates are a principal ingredient of most detergents. Hence detergent products sold in Chicago must now be made with substitutes for phosphates.

Plaintiffs Soap and Detergent Association, Monsanto Company and Amway Corporation have failed to prove the jurisdictional amount required by 28 U.S.C. § 1331, and their complaints will be dismissed. The remaining plaintiffs, The Procter and Gamble Company, a detergent manufacturer, and FMC Corporation, a phosphate manufacturer, have proved that well in excess of $10,000 is involved in their cases, and diversity is not contested.

The ordinance in question was adopted by the City Council on October 14, 1970 upon the recommendation of its Committee on Environmental Control which had held public hearings on the matter for three days. The Committee did not make a written report and the City Council made no findings or declarations of policy, so the specific bases for the ordinance became known only in the course of this litigation. The court ruled at the close of the plaintiffs' case that it had produced sufficient evidence to require the City to justify the ordinance.

We now find and conclude that the City failed to sustain this burden, under the particular facts and circumstances of this case, and that the two remaining plaintiffs are entitled to the declaratory and injunctive relief prayed for. The evidence is largely technical and too voluminous to summarize in detail, but the court finds the following controlling facts have been proved.

The ordinance provides in pertinent part as follows:

§ 17-7.3(b)  It shall be unlawful for any person, firm, or corporation to sell, offer or expose for sale, give or furnish any synthetic detergent or detergent containing any phosphorus, expressed as elemental phosphorus, including synthetic detergents or detergents manufactured for machine dish-

John C. Berghoff, Jr., James E. Hastings, Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., David Machniec, Pierson, Ball & Dowd, Allan J. Topol, Covington & Burling, Washington, D. C., for plaintiffs.

Richard L. Curry, Corp. Counsel, Henry F. Weber, Asst. Corp. Counsel, Chicago, Ill., for defendant.

### DECISION and ORDER

McMILLEN, District Judge.

This case came on for trial on a declaratory action brought by an association and four of its members engaged in manufacturing detergents and phosphates. Plaintiffs seek to set aside an ordinance of the City of Chicago which since June 30, 1972 has made it a criminal offense to sell detergents containing phosphorus within the City. Phosphorus is the element from which phos-

washers, dairy equipment, beverage equipment, food processing equipment and industrial cleaning equipment, within the City of Chicago from and after June 30, 1972.

§ 17-7.4 *Penalties.* Any person found guilty of violating, disobeying, omitting, neglecting, or refusing to comply with, or resisting or opposing the enforcement of any of the provisions of this Article VII, . . . upon conviction thereof shall be punished by a fine of not less than one hundred dollars ($100.) nor more than $300.00 for the first offense, and not less than $300.00 nor more than $500.-00 for the second and each subsequent offense, in any 180-day period, or shall be punishable as a misdemeanor by incarceration in the county jail for a term not to exceed six months under procedures set forth in Section 1-2-1.-1 of the Illinois Municipal Code (Ill. Rev.Stat.1969, ch. 24, par. 1-2-1.1) as amended, or by both fine and imprisonment. A separate and distinct offense shall be regarded as committed each day on which such person shall continue or permit any such violation, or failure to comply is permitted to exist after notification thereof.

Similar ordinances have been adopted by various jurisdictions, state and local, in widely separated areas of the United States. As of September 1972, four small municipalities neighboring Chicago, and also the unincorporated area of Lake County, Illinois prohibit the sale of detergents containing any phosphorus. Other neighboring jurisdictions, including the states of Indiana and Michigan, limit the phosphorus content to 8.7%. Several municipalities have repealed or delayed the effective date of their ordinances, and most of the other municipalities surrounding Chicago have no restrictions on the sale or use of phosphate detergents.

Nationwide, a patchwork pattern of ordinances and laws has grown up over the past three years ranging from complete prohibition of phosphate detergents in Dade County, Florida, Erie County (Buffalo), New York, and two additional states outside of the Mid-West, an 8.7% limitation in many other localities, and no controls elsewhere. These laws and ordinances have become too numerous and diverse to summarize beyond the date of the stipulation of the parties dated September 26, 1972. The task of complying with and contesting this rash of legislation has required considerable attention of the industry, one corporate official testifying that he spends a day a week on the problem. Members of the industry or its association have spent several millions of dollars to develop a substitute for phosphate in detergents, but none of these efforts have yet been successful. Consequently, in many areas plaintiffs have replaced all or most of the phosphorus content of detergents with soda ash, a less effective and cheaper component.

Plaintiffs contend that detergents containing phosphorus are a useful and harmless product and that the City's ordinance unreasonably and unjustifiably interferes with their normal distribution and sale of these products in interstate commerce. The original complaints also alleged unconstitutional discrimination and a violation of the plaintiffs' right to due process, among other things, but on October 30, 1972 they filed a Second Amended Complaint which was limited to an alleged violation of the Commerce Clause of the Constitution of the United States (Article I, Section 8, Clause 3). Plaintiffs seek a declaration that the ordinance is unconstitutional and to enjoin its enforcement.

The City contends that the ordinance is justified to protect the Illinois Waterway into which the Metropolitan Sanitary District discharges the City's sewage effluent and also to protect the City's water supply which comes from Lake Michigan. It contends that phosphates unduly accelerate the natural eutrophication of both of these bodies of water and would be unreasonably expensive to remove by sewage treatment. Since detergents contribute approxi-

mately 50% of the phosphates in Chicago's sewage effluent, it asserts that it has the power and the right to prohibit the introduction of this element into the system, despite any interference that this may have on interstate commerce. In short the City argues that the benefits resulting from the ordinance outweigh any disadvantage to the plaintiffs or their customers, including housewives and businesses using detergents. It is worth noting that none of these groups nor any of the communities which depend on the two bodies of water have sought to intervene in this case.

The City does not contend that it has the right to prohibit the sale of safe and useful products within its confines, and plaintiffs do not contend that they have the right to distribute and sell a product in interstate commerce which damages the public's water. The principal issues therefore are whether the ordinance does interfere with the free flow of interstate commerce and, if so, whether this is justified by the benefits realized by the ordinance. The parties have offered their evidence in a commendably thorough and forthright manner, so that the court has been greatly assisted in deciding this case on a much more complete record than was presented to the Committee on Environmental Control of the Chicago City Council.

There can be no doubt that local governments have the right to enact laws for the protection of the public, even to the extent of regulating or excluding certain undesirable activities from interstate commerce. For example, the State of Florida can forbid the interstate shipment of inedible or immature citrus fruit in order to protect its industry's reputation. Sligh v. Kirkwood, Sheriff of Orange County, Florida, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915). Trucks over a certain size and weight were held to be properly excluded by one state in order to protect its highways. South Carolina Highway Department v. Barnwell Brothers, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1939). A smoke ordinance of the City

of Detroit was justified as a health measure even though it burdened interstate navigation. Huron Portland Cement Company v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). In these and similar cases the local interests protected by the laws in question were found to justify the reasonable exercise of local police powers.

On the other hand, the State of Illinois cannot require interstate trucks to use specially designed mudguards when this is not reasonably necessary for the protection of its citizens. Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). Arizona cannot require its melons to be packaged within the state if this is primarily for the purpose of creating a local enterprise. Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). And the State of New York, in order to protect local economic interests, cannot refuse to issue a permit for a plant to produce milk in New York to be shipped to Boston. H. P. Hood & Sons v. DuMond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949). In all of the foregoing cases, the state and local laws were held to be an impermissible interference with interstate commerce because they were not shown to be sufficiently necessary for the health, safety or welfare of the local citizenry.

Modern-day detergents were developed and patented after World War II by chemists who discovered that phosphates when combined with other materials would clean better than soap, particularly in hard water. Detergents contributed to the development of the automatic washing machines and dishwashers, and the two complementary lines of products flourished. Detergents soon outstripped soap in volume and now contribute gross sales exceeding $2,000,000,000 a year to the economy.

The evidence is clear that a detergent made with phosphate is a more effective cleaning agent than non-phosphate detergents when used with Chicago's water and is not at all harmful to the persons using it or wearing clothes or eating

from utensils washed in it. In the form of phosphates, phosphorus constituted 12.3% of Procter and Gamble's leading detergent, Tide, and up to 25% of some phosphate detergents, before the ordinance required a reformulation. Phosphorus is a natural and benign element appearing to a greater or lesser extent in all living organisms, including the human body.

Besides establishing beyond question that phosphate detergents are not only safe but also beneficial to the users, plaintiffs also proved that the prohibition of the sale of these products in the City of Chicago seriously disrupted the flow of interstate commerce. The normal distribution system which developed for detergents is area-wide, not city-wide. They are manufactured in plants located in various cities in the Mid-West and then sold to major chain stores and similar distributors. In the Chicago area these purchasers store their products in warehouses and distribute them when needed to retail stores throughout Northern Illinois and Indiana, and Southern Wisconsin and Michigan. The proprietors of these warehouses, who are customers of the plaintiff manufacturer, have adamantly refused to carry two or three formulations for each of the 275 varieties of detergents because this would double or triple the number of "slots" which would be required. Furthermore they refuse to incur the risk of becoming exposed to heavy fines by mistakenly delivering detergents with phosphates to stores in Chicago. The undisputed evidence is that 15 of the 17 major customers of Procter and Gamble servicing Chicago and environs chose to carry only non-phosphate detergents after June 30, 1972 and the two which carry two formulations sell and distribute primarily outside of the City.

The result is that the plaintiffs' normal manufacturing and distribution processes had to be drastically revised because of the Chicago ordinance. Some of the plants which had manufactured only one detergent formulation now must be scheduled to manufacture two;

other plants have been devoted to manufacturing non-phosphate detergents which had previously manufactured for a much larger area. This requires obtaining raw materials from different sources, shutting down the plants more frequently for cleaning and change-over operations, changing shipping patterns to accomodate the Chicago market, and many other uneconomical makeshifts. The plaintiff Procter and Gamble Company estimates that its shipping costs for raw materials and finished products have been increased $2,500,000 a year due to the changed production arrangements required for the Chicago area. It did not sell any detergents in the Chicago area for five months after June 30, 1972 because it did not make a satisfactory non-phosphate detergent, thereby losing approximately $4,700,000 in sales. It has completely withdrawn a tablet detergent from the Chicago market because of inability to formulate it effectively without phosphate. Plaintiff FMC Corporation has lost sales of phosphates amounting to about $500,000 a year to its customers selling in the Chicago area.

■ The court does not consider relevant whether it is more profitable to manufacture the non-phosphate detergents; the question is whether the plaintiffs have the right to sell and ship a harmless product in interstate commerce. The evidence of increased costs of manufacture and distribution, however, is relevant to show a burden on interstate commerce. It then becomes the task of the defendant City to justify its ordinance by showing at least some need to protect the public health, safety or welfare. This need is not measurable in dollars and cents but can be weighed equitably against the plaintiffs' right to free trade. E. g., Bibb v. Navajo Freight Lines, *supra* p. 47.

The City's justifications for the ordinance were of an indirect nature, to the effect that excessive phosphates in sewage cause undesirable changes in the Illinois Waterway and in Lake Michigan. All of Chicago's sewage is collected and

treated by the Metropolitan Sanitary District, an independent governmental entity. Most of this effluent is then channelled into the Sanitary and Ship Canal which enters the Des Plaines River at Lockport and then becomes the Illinois River. Only a very small amount of phosphates are removed by the Metropolitan Sanitary District and none is removed intentionally except at one plant. Another plant is under construction which will remove phosphate from effluent discharged into the Fox River and thence into the Illinois. Phosphates will be removed by that plant in order to comply with the proposed regulation of the Illinois Pollution Control Board, but the Metropolitan Sanitary District has officially opposed any requirement that it remove phosphates from sewage. Nor is there any limit set by the Illinois Pollution Control Board on the amount of phosphate which can be discharged into the Illinois River.

Phosphate in water is not itself a pollutant. Some communities add it to water in the purification process for the purpose of softening. Excessive phosphates in the sewage effluent, however, can cause nuisance algae to flourish, resulting in a deterioration of the fish species, an unpleasant odor from decaying algae, and a bad taste in the water when used for drinking. The long-range effect of nuisance algae is to accelerate natural eutrophication and, by over-abundance, to ultimately destroy the value of a body of water. This has happened in parts of Lake Erie.

The weight of the evidence showed that there was no significant amount of nuisance algae in the Illinois River before the ordinance was passed and consequently that the ordinance was not required for this objective. Neither the State of Illinois nor the Federal government nor any municipality or person along these rivers requested this ordinance or testified in its support before the City Council's Committee or in this court. In fact scientists of the State of Illinois and Missouri testified in the case at bar that nuisance algae was no problem in the Illinois and Mississippi Rivers, and no evidence was offered of algae in the waterways above the Illinois River.

The reason for the lack of nuisance algae in the Illinois and Mississippi Rivers is apparently attributable to such causes as excessive turbidity, the periodic flushing of the river by high water, and the presence of some undefined trace elements which inhibit the growth of algae. More to the point, however, is the fact that the Illinois and Mississippi Rivers are so overloaded with phosphates that the removal of phosphates from detergents can have no effect on their plant or fish life. These rivers carry a higher percentage of phosphates than any other river in the United States, contributed by leaves and other natural sources, agricultural fertilizers, industrial effluent, human wastes and detergents. As a result the Illinois River at Peoria contains at least 25 times as much phosphate as is necessary to sustain nuisance algae, of which the Chicago detergents contributed approximately 25%. The maximum or "limiting" amount of phosphate which nuisance algae can use is about .02 milligrams per liter; any amount above this is surplus, having no effect on the growth of algae.

According to intensive samplings made by the Illinois State Water Survey, the Illinois River at Peoria before the Chicago ordinance became effective contained a minimum of .5 milligrams of phosphate per liter and averaged 1.5 milligrams. After the ordinance went into effect, the lowest phosphate count was .025 milligrams per liter and the average was .5, still far above the limiting factor for nuisance algae. Although these measurements were taken some miles downstream from Lockport, the witness expressed the scientific opinion that 75 to 80% of Chicago's phosphates continue in the stream down to Peoria and that the loss is more than regained by contributions added by industry, sewage and other factors below Lockport. Nonetheless he testified that there was

no nuisance algae in the Illinois River and that phosphates did not damage or threaten its water. Even the defendant's witnesses admitted that phosphates are not a limiting factor for nuisance algae at any place down to and including the Gulf of Mexico, before or after the ordinance.

After the ordinance had been in effect for four months, one of the plaintiffs' witnesses took a quantity of water from the Illinois River at two spots downstream from Lockport and grew algae in it under laboratory conditions. He found that the re-introduction of phosphates had no discernible effect on the growth of algae in this particular water but that the addition of nitrogen did. He concluded that the elimination of phosphates from detergents had had no effect on the growth of algae and was not justified for this objective.

By the time of trial, the Chicago ordinance had been in effect for almost six months, and an earlier provision of the ordinance, reducing phosphorus in many detergents to 8.7%, had been in effect since February 1, 1971. The plaintiffs and all other manufacturers of detergents have apparently complied fully with the ordinance, and as a result the amount of phosphates in the effluent of the Metropolitan Sanitary District has decreased markedly. The defendant therefore had the benefit of an actual test period after February 1, 1971, but it offered no evidence of any change in the alleged algae in the rivers. The only evidence of tests after the effective dates of the ordinance was the plaintiffs' witness who testified convincingly that the ordinance had no effect.

The City of Chicago introduced a series of aerial photographs into evidence which purported to show algae growth in the Illinois River at various places. These were taken during the hearings conducted by the Committee on Environmental Control in the summer of 1970 but were not accompanied by any physical inspections or analysis of the substances or water. Although the photographs were quite impressive at first sight, the plaintiffs demonstrated that most of them were taken at sites along the Illinois River where tributaries containing nuisance algae flowed into the Illinois. The photographs therefore were not of sufficient weight to establish a justification for the ordinance.

■ The plaintiffs contended, at least in the earlier stages of this litigation, that the City of Chicago has no power or authority to protect the water quality for persons who live downstream. Although it is true that the City cannot legislate beyond its boundaries, it does have the right, indeed the obligation, to prevent its activities from damaging its neighbors. Cf. Sligh v. Kirkwood, Sheriff of Orange County, Florida, 237 U.S. 52 at p. 60, 35 S.Ct. 501, 59 L.Ed. 835 (1915). Just as Chicago is not privileged to dump raw sewage into the Illinois River, so likewise it cannot lawfully dump other pollutants into the waterways or air. This is not a jurisdictional problem, it is a question of controlling nuisances, and the City undoubtedly has the power to do this.

■ On the other hand, the City cannot interfere with interstate commerce merely for hortatory purposes, to influence other cities to refrain from discharging phosphates into Lake Michigan. The concentration of phosphates in the Lake is far lower than in the Illinois River, approximately at the limiting amount of .02 milligrams per liter, and the danger of nuisance algae is therefore much more real. The Lake does not have the turbidity or flushing antidotes found in the rivers, and the excessive discharge of phosphates into the Lake can actually cause the bad results which the City contends have occurred in the Illinois Waterway.

The City has not shown that any appreciable amount of sewage from Chicago gets into Lake Michigan, however. The only places where Chicago sewage is known to enter the Lake on occasion is from the Chicago River and the Calumet River. Both of these rivers now flow away from the Lake, and their reversal

into the Lake is controlled by locks. During excessively heavy rainstorms these two rivers can be allowed to flow into the Lake as a safety valve to relieve over-loading of the Metropolitan Sanitary District facilities. However, this has only occurred from the Chicago River on two occasions in the last ten years and on two other occasions from the Calumet River during the same decade. The amount of discharge into the Lake is not accurately measured, but it has been relatively minimal, usually much less than 200,000,000 cubic feet on each occasion. The back-flow contains only about 45% of raw sewage and a proportionately smaller amount of phosphate. The amount of phosphate actually discharged into the Lake by these occasional back-flows is not contained in any measurements made by the City or by the Metropolitan Sanitary District, but we conclude from the evidence that in the years of serious back-flows, detergents contribute not more than 250 tons of the 15,000,000 pounds of phosphates dumped into the Lake each year, approximately 3%. Thus this secondary justification for the ordinance is found to be insufficient.

We believe that the Chicago detergent ordinance was enacted in good faith and for laudatory objectives, and that a legislative enactment should not be interfered with by the courts unless clearly required. Nevertheless we find and conclude that Section 17–7.3(b) of the Chicago ordinance, prohibiting the sale of detergents containing any phosphorus, constitutes an unjustified interference with interstate commerce and therefore violates Article I, Section 8, Clause 3 of the United States Constitution. This does not necessarily mean that similar ordinances in other jurisdictions cannot be sustained, where the effects of discharging phosphates into the public water supply may outweigh the interference with interstate commerce.

It is also possible that area-wide legislation or regulation may reduce the phosphate contributions into the Illinois Waterway to a level where detergents should be controlled similarly with other sources of phosphates, but this is not contemplated even under the Federal Water Pollution Control Act until July 1, 1977 at the earliest. (P.L. 92–500, Section 301(b)). Until plenary jurisdictions take action to control all phosphates down to the limiting level so that phosphates from detergents then might have some effect on the Illinois Waterway, the City of Chicago should adopt no more than a stand-by ordinance, to become effective if and when this level is approached.

If Section 17–7.3(b) of the Municipal Code prohibiting the sale of detergents containing any phosphorus is stricken, then Section 17–7.3(a) which limits sales of detergents to those containing less than 8.7% phosphorus would remain, theoretically. However, it is apparent that even this lesser restriction has insufficient legal justification and would have substantially the same effect on interstate commerce as does the total ban. Furthermore the intent of the City Council seems to have been to supercede the 8.7% requirement by the total ban, thus terminating the former requirement by June 30, 1972. Thus Section 17–7.3(a) also fails, both as a matter of statutory construction and as a matter of constitutional law, and with these two sections void, the entire ordinance, including the labelling and enforcement provisions, are of no effect.

The court reserved ruling on some of the documents offered during trial and in depositions. The objections to plaintiffs' exhibits 13 and 14 are sustained. The objections to defendant's exhibits 6, 39, 42, 46, 51, 52, 53, 54 and 55 are sustained. The objections to defendant's exhibits 26, 27, 28 and 29 are overruled. 28 U.S.C. § 1733.