## HURON PORTLAND CEMENT CO. *v.* CITY OF DETROIT ET AL.

No. 86.   Argued February 29, 1960.—Decided April 25, 1960.

*Alfred E. Lindbloom* argued the cause for appellant. With him on the brief were *Charles Wright, Jr.* and *Laurence A. Masselink.*

*John F. Hathaway* argued the cause for appellees. With him on the brief were *Nathaniel H. Goldstick, John D. O'Hair* and *Roger P. O'Connor.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This appeal from a judgment of the Supreme Court of Michigan draws in question the constitutional validity of certain provisions of Detroit's Smoke Abatement Code as applied to ships owned by the appellant and operated in interstate commerce.

The appellant is a Michigan corporation, engaged in the manufacture and sale of cement. It maintains a fleet of five vessels which it uses to transport cement from its mill in Alpena, Michigan, to distributing plants located in various states bordering the Great Lakes. Two of the ships, the S. S. *Crapo* and the S. S. *Boardman,* are equipped with hand-fired Scotch marine boilers. While these vessels are docked for loading and unloading it is necessary, in order to operate deck machinery, to keep the boilers fired and to clean the fires periodically. When the fires are cleaned, the ship's boiler stacks emit smoke which in density and duration exceeds the maximum standards allowable under the Detroit Smoke Abatement Code. Structural alterations would be required in order to insure compliance with the Code.

Criminal proceedings were instituted in the Detroit Recorder's Court against the appellant and its agents for violations of the city law during periods when the vessels were docked at the Port of Detroit. The appellant brought an action in the State Circuit Court to enjoin the city from further prosecuting the pending litigation in the Recorder's Court, and from otherwise enforcing the smoke ordinance against its vessels, "except where the emission of smoke is caused by the improper firing or the improper use of the equipment upon said vessels." The Circuit Court refused to grant relief, and the Supreme Court of Michigan affirmed, 355 Mich. 227, 93 N. W. 2d 888. An appeal was lodged here, and we noted probable jurisdiction, 361 U. S. 806.

In support of the claim that the ordinance cannot constitutionally be applied to appellant's ships, two basic arguments are advanced. First, it is asserted that since the vessels and their equipment, including their boilers, have been inspected, approved and licensed to operate in interstate commerce in accordance with a comprehensive system of regulation enacted by Congress, the City of

Detroit may not legislate in such a way as, in effect, to impose additional or inconsistent standards. Secondly, the argument is made that even if Congress has not expressly pre-empted the field, the municipal ordinance "materially affects interstate commerce in matters where uniformity is necessary." We have concluded that neither of these contentions can prevail, and that the Federal Constitution does not prohibit application to the appellant's vessels of the criminal provisions of the Detroit ordinance.[1]

The ordinance was enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants. Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power. In the exercise of that power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 299; *The Steamboat New York* v. *Rea,* 18 How. 223; *Morgan* v. *Louisiana,* 118 U. S. 455; *The Minnesota Rate Cases,* 230 U. S. 352; *Wilmington Transp. Co.* v. *California Railroad Comm.,*

---

[1] The Detroit legislation also contains provisions making it unlawful to operate any combustion equipment in the city without a certificate, § 2.16, providing for an annual inspection of all such equipment used in the city, § 2.17, and further providing for the sealing of equipment in the event that the inspection requirements are repeatedly ignored, § 2.20. There is nothing in the record to indicate that the city has at any time attempted to enforce these provisions with respect to the appellant's ships. Accordingly, we do not reach the question of the validity of the inspection sections as they might be applied to appellant, but limit our consideration solely to what is presented upon this record—the enforcement of the criminal provisions of the Code for violation of the smoke emission provisions.

236 U. S. 151; *Vandalia R. Co. v. Public Service Comm.,* 242 U. S. 255; *Stewart & Co. v. Rivara,* 274 U. S. 614; *Welch Co. v. New Hampshire,* 306 U. S. 79.

The basic limitations upon local legislative power in this area are clear enough. The controlling principles have been reiterated over the years in a host of this Court's decisions. Evenhanded local regulation to effectuate a legitimate local public interest is valid unless preempted by federal action, *Erie R. Co. v. New York,* 233 U. S. 671; *Oregon-Washington Co. v. Washington,* 270 U. S. 87; *Napier v. Atlantic Coast Line,* 272 U. S. 605; *Missouri Pacific Co. v. Porter,* 273 U. S. 341; *Service Transfer Co. v. Virginia,* 359 U. S. 171, or unduly burdensome on maritime activities or interstate commerce, *Minnesota v. Barber,* 136 U. S. 313; *Morgan v. Virginia,* 328 U. S. 373; *Bibb v. Navajo Freight Lines,* 359 U. S. 520.

In determining whether state regulation has been preempted by federal action, "the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State." *Savage v. Jones,* 225 U. S. 501, 533. See also *Reid v. Colorado,* 187 U. S. 137; *Asbell v. Kansas,* 209 U. S. 251; *Welch Co. v. New Hampshire,* 306 U. S. 79; *Maurer v. Hamilton,* 309 U. S. 598.

In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when "conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of

the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution." *Sherlock* v. *Alling,* 93 U. S. 99, 103; *Austin* v. *Tennessee,* 179 U. S. 343; *Louisville & Nashville R. Co.* v. *Kentucky,* 183 U. S. 503; *The Minnesota Rate Cases,* 230 U. S. 352; *Boston & Maine R. Co.* v. *Armburg,* 285 U. S. 234; *Collins* v. *American Buslines, Inc.,* 350 U. S. 528. But a state may not impose a burden which materially affects interstate commerce in an area where uniformity of regulation is necessary. *Hall* v. *DeCuir,* 95 U. S. 485; *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761; *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520.

Although verbal generalizations do not of their own motion decide concrete cases, it is nevertheless within the framework of these basic principles that the issues in the present case must be determined.

## I.

For many years Congress has maintained an extensive and comprehensive set of controls over ships and shipping. Federal inspection of steam vessels was first required in 1838, 5 Stat. 304, and the requirement has been continued ever since. 5 Stat. 626; 10 Stat. 61; 14 Stat. 227; 16 Stat. 440; 22 Stat. 346; 28 Stat. 699; 32 Stat. 34; 34 Stat. 68; 60 Stat. 1097; 73 Stat. 475. Steam vessels which carry passengers must pass inspection annually, 46 U. S. C. § 391 (a), and those which do not, every two years. 46 U. S. C. § 391 (b). Failure to meet the standards invoked by law results in revocation of the inspection certificate, or refusal to issue a new one, 46 U. S. C. § 391 (d). It is unlawful for a vessel to operate without such a certificate. 46 U. S. C. § 390c (a).

These inspections are broad in nature, covering "the boilers, unfired pressure vessels, and appurtenances

thereof, also the propelling and auxiliary machinery, electrical apparatus and equipment, of all vessels subject to inspection . . . ." 46 U. S. C. § 392 (b). The law provides that "No boiler . . . shall be allowed to be used if constructed in whole or in part of defective material or which because of its form, design, workmanship, age, use, or for any other reason is unsafe." 46 U. S. C. § 392 (c).

As is apparent on the face of the legislation, however, the purpose of the federal inspection statutes is to insure the seagoing safety of vessels subject to inspection. Thus 46 U. S. C. § 392 (c) makes clear that inspection of boilers and related equipment is for the purpose of seeing to it that the equipment "may be safely employed in the service proposed." The safety of passengers, 46 U. S. C. § 391 (a), and of the crew, 46 U. S. C. § 391 (b), is the criterion. The thrust of the federal inspection laws is clearly limited to affording protection from the perils of maritime navigation. Cf. *Ace Waterways* v. *Fleming,* 98 F. Supp. 666. See also *Steamship Co.* v. *Joliffe,* 2 Wall. 450.

By contrast, the sole aim of the Detroit ordinance is the elimination of air pollution to protect the health and enhance the cleanliness of the local community. Congress recently recognized the importance and legitimacy of such a purpose, when in 1955 it provided:

"[I]n recognition of the dangers to the public health and welfare, injury to agricultural crops and livestock, damage to and deterioration of property, and hazards to air and ground transportation, from air pollution, it is hereby declared to be the policy of Congress to preserve and protect the primary responsibilities and rights of the States and local governments in controlling air pollution, to support and aid technical research to devise and develop methods of abating such pollution, and to provide Federal tech-

nical services and financial aid to State and local government air pollution control agencies and other public or private agencies and institutions in the formulation and execution of their air pollution abatement research programs." 69 Stat. 322; 42 U. S. C. § 1857.

Congressional recognition that the problem of air pollution is peculiarly a matter of state and local concern is manifest in this legislation. Such recognition is underlined in the Senate Committee Report:

"The committee recognizes that it is the primary responsibility of State and local governments to prevent air pollution. The bill does not propose any exercise of police power by the Federal Government and no provision in it invades the sovereignty of States, counties or cities." S. Rep. No. 389, 84th Cong., 1st Sess. 3.

We conclude that there is no overlap between the scope of the federal ship inspection laws and that of the municipal ordinance here involved.[2]  For this reason we cannot find that the federal inspection legislation has pre-empted local action. To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists. *Savage* v. *Jones,* 225 U. S. 501; *Welch Co.* v. *New Hampshire,* 306 U. S. 79; *Maurer* v. *Hamilton,* 309 U. S. 598.

An additional argument is advanced, however, based not upon the mere existence of the federal inspection standards, but upon the fact that the appellant's vessels were actually licensed, 46 U. S. C. § 263, and enrolled,

---

[2] Compare, *Napier* v. *Atlantic Coast Line R. Co.,* where the Court concluded that "the [Locomotive] Boiler Inspection Act . . . was intended to occupy the field." 272 U. S. 605, 613.

46 U. S. C. §§ 259–260, by the national government. It is asserted that the vessels have thus been given a dominant federal right to the use of the navigable waters of the United States, free from the local impediment that would be imposed by the Detroit ordinance.

The scope of the privilege granted by the federal licensing scheme has been well delineated. A state may not exclude from its waters a ship operating under a federal license. *Gibbons* v. *Ogden,* 9 Wheat. 1. A state may not require a local occupation license, in addition to that federally granted, as a condition precedent to the use of its waters. *Moran* v. *New Orleans,* 112 U. S. 69. While an enrolled and licensed vessel may be required to share the costs of benefits it enjoys, *Huse* v. *Glover,* 119 U. S. 543, and to pay fair taxes imposed by its domicile, *Transportation Co.* v. *Wheeling,* 99 U. S. 273, it cannot be subjected to local license imposts exacted for the use of a navigable waterway, *Harman* v. *Chicago,* 147 U. S. 396. See also *Sinnot* v. *Davenport,* 22 How. 227.

The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce. Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws, *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 299, or local quarantine laws, *Morgan's Steamship Co.* v. *Louisiana Board of Health,* 118 U. S. 455, or local safety inspections, *Kelly* v. *Washington,* 302 U. S. 1, or the local regulation of wharves and docks, *Packet Co.* v. *Catlettsburg,* 105 U. S. 559. Indeed this Court has gone so far as to hold that a state, in the exercise of its police power, may actually seize and pronounce the forfeiture of a vessel "licensed for the coasting trade, under the laws of the United States, while engaged in that trade." *Smith* v. *Maryland,* 18 How. 71, 74. The present case obvi-

ously does not even approach such an extreme, for the Detroit ordinance requires no more than compliance with an orderly and reasonable scheme of community regulation. The ordinance does not exclude a licensed vessel from the Port of Detroit, nor does it destroy the right of free passage. We cannot hold that the local regulation so burdens the federal license as to be constitutionally invalid.

## II.

The claim that the Detroit ordinance, quite apart from the effect of federal legislation, imposes as to the appellant's ships an undue burden on interstate commerce needs no extended discussion. State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand. *Hennington* v. *Georgia,* 163 U. S. 299; *Lake Shore & Mich. South. R. Co.* v. *Ohio,* 173 U. S. 285; *Pennsylvania Gas Co.* v. *Public Service Comm.,* 252 U. S. 23; *Milk Board* v. *Eisenberg Co.,* 306 U. S. 346; *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28.

It has not been suggested that the local ordinance, applicable alike to "any person, firm or corporation" within the city, discriminates against interstate commerce as such. It is a regulation of general application, designed to better the health and welfare of the community. And while the appellant argues that other local governments might impose differing requirements as to air pollution, it has pointed to none. The record contains nothing to suggest the existence of any such competing or conflicting local regulations. Cf. *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520. We conclude that no impermissible burden on commerce has been shown.

*The judgment is affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE FRANK-FURTER concurs, dissenting.

The Court treats this controversy as if it were merely an inspection case with the City of Detroit supplementing a federal inspection system as the State of Washington did in *Kelly* v. *Washington,* 302 U. S. 1. There a state inspection system touched matters "which the federal laws and regulations" left "untouched." *Id.,* at 13. This is not that type of case. Nor is this the rare case where state law adopts the standards and requirements of federal law and is allowed to exact a permit in addition to the one demanded by federal law. *California* v. *Zook,* 336 U. S. 725, 735. Here we have a criminal prosecution against a shipowner and officers of two of its vessels for using the very equipment on these vessels which the Federal Goverment says may be used. At stake are a possible fine of $100 on the owner and both a fine and a 30-day jail sentence on the officers.

Appellant has a federal certificate for each of its vessels—S. S. *John W. Boardman,* S. S. *S. T. Crapo,* and others. The one issued on March 21, 1956, by the United States Coast Guard for S. S. *S. T. Crapo* is typical. The certificate states "The said vessel is permitted to be navigated for one year on the Great Lakes." The certificate specifies the boilers which are and may be used—"Main Boilers Number 3, Year built 1927, Mfr. Manitowoc Boiler Wks." It also specifies the fuel which is used and is to be used in those boilers—"Fuel coal."

Appellant, operating the vessel in waters at the Detroit dock, is about to be fined criminally for using the precise equipment covered by the federal certificate because, it is said, the use of that equipment will violate a smoke ordinance of the City of Detroit.

The federal statutes give the Coast Guard the power to inspect "the boilers" of freight vessels every two

years,[1] and provide that when the Coast Guard approves the vessel and her equipment throughout, a certificate to that effect shall be made.[2]

The requirements of the Detroit smoke ordinance are squarely in conflict with the federal statute. Section 2.2A of the ordinance prohibits the emission of the kind of smoke which cannot be at all times prevented by vessels equipped with hand-fired Scotch marine boilers such as appellant's vessels use. Section 2.16 of the ordinance makes it unlawful to use any furnace or other combustion equipment or device in the city without a certificate of operation which issues only after inspection. Section 2.17 provides for an annual inspection of every furnace or other combustion equipment used within the city. Section 2.20 provides that if an owner has been previously notified of three or more violations of the ordinance within any consecutive 12-month period he shall be notified to show cause before the Commissioner why the equipment should not be sealed. At the hearing, if the Commissioner finds that adequate corrective means have not been employed to remedy the situation, the equipment shall be sealed. Section 3.2 provides for a fine of not more than $100 or imprisonment for not more than 30 days or both upon conviction of any violation of any provision of the ordinance, and each day a violation is permitted to exist constitutes a separate offense.

Thus it is plain that the ordinance requires not only the inspection and approval of equipment which has been

---

[1] 46 U. S. C. § 392.

[2] 46 U. S. C. § 399 provides in part:

"When the inspection of a steam vessel is completed and the Secretary of the Department in which the Coast Guard is operating approves the vessel and her equipment throughout, he shall make and subscribe a certificate to that effect."

inspected and approved by the Coast Guard but also the sealing of equipment, even though it has been approved by the Coast Guard. Under the Detroit ordinance a certificate of operation would not issue for a hand-fired Scotch marine boiler, even though it had been approved by the Coast Guard.[3] In other words, this equipment approved and licensed by the Federal Government for use on navigable waters cannot pass muster under local law.

If local law required federally licensed vessels to observe local speed laws, obey local traffic regulations, or dock at certain times or under prescribed conditions, we would have local laws not at war with the federal license, but complementary to it. In *Kelly* v. *Washington, supra,* at 14–15, the Court marked precisely that distinction. While it allowed state inspection of hull and machinery of tugs over and above that required by federal statutes, it noted that state rules which changed the federal

---

[3] The trial court in its opinion said:

"It is agreed it is impossible to prevent emission of the kind of smoke prohibited by the smoke ordinance if the vessel is equipped with hand-fired scotch marine boilers. The Boardman has two boilers each with two doors and one steam air jet over each door. The Crapo has three boilers, each with two doors and one steam air jet over each door. The steam jets being installed at the suggestion of Benjamin Linsky, former Chief of the Bureau of Smoke Abatement for the City.

"Testimony showed also that the plaintiff used a chemical in an attempt to reduce the smoke. Plaintiff urges it has done everything that it could possibly do with the equipment it has to prevent the emission of smoke. It was shown on trial that the fleet is subject to periodic inspection by the coast guard, which issues a search [*sic*] of inspection. The Crapo in 1955, docked at Detroit twenty-two times for an average docking time of 23.9 hours and the Boardman docked at Detroit 25 times that year with an average stay of 16.2 hours. Both vessels were constantly engaged in interstate and foreign commerce during this period."

standards "for the structure and equipment of vessels" would meet a different fate:

> "The state law is a comprehensive code. While it excepts vessels which are subject to inspection under the laws of the United States, it has provisions which may be deemed to fall within the class of regulations which Congress alone can provide. For example, Congress may establish standards and designs for the structure and equipment of vessels, and may prescribe rules for their operation, which could not properly be left to the diverse action of the States. The State of Washington might prescribe standards, designs, equipment and rules of one sort, Oregon another, California another, and so on. But it does not follow that in all respects the state Act must fail."

This case, like *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605, involves the collision between a local law and a federal law which gives a federal agency the power to specify or approve the equipment to be used by a federal licensee. In that case one State required automatic fire doors on locomotives of interstate trains and another State required cab curtains during the winter months. The Interstate Commerce Commission, though it had the power to do so under the Boiler Inspection Act, had never required a particular kind of fire door or cab curtain. The Court, speaking through Mr. Justice Brandeis, said, at 612–613:

> "The federal and the state statutes are directed to the same subject—the equipment of locomotives. They operate upon the same object. It is suggested that the power delegated to the Commission has been exerted only in respect to minor changes or additions. But this, if true, is not of legal significance. It is also urged that, even if the Commission has power to prescribe an automatic firebox door and a cab

curtain, it has not done so; and that it has made no other requirement inconsistent with the state legislation. This, also, if true, is without legal significance. The fact that the Commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the Act delegating the power. We hold that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field."

Here the Coast Guard would be entitled to insist on different equipment. But it has not done so. The boats of appellant, therefore, have credentials good for any port; and I would not allow this local smoke ordinance to work in derogation of them. The fact that the Federal Government in certifying equipment applies standards of safety for seagoing vessels, while Detroit applies standards of air pollution seems immaterial. Federal pre-emption occurs when the boilers and fuel to be used in the vessels are specified in the certificate. No state authority can, in my view, change those specifications. Yet that is in effect what is allowed here.

As we have seen, the Detroit ordinance contains provisions making it unlawful to operate appellant's equipment without a certificate from the city and providing for the sealing of the equipment in case of three or more violations within any 12-month period. The Court says that those sanctions are not presently in issue, that it reserves decision as to their validity, and that it concerns itself only with "the enforcement of the criminal provisions" of the ordinance. Yet by what authority can a local government fine people or send them to jail for using in interstate commerce the precise equipment which the federal regulatory agency has certified and approved? The burden of these criminal sanctions on the owners and officers, particularly as it involves the risk of imprisonment, may indeed be far more serious than a mere sealing

of the equipment. Yet whether fine or imprisonment is considered, the effect on the federal certificate will be crippling. However the issue in the present case is stated it comes down to making criminal in the Port of Detroit the use of a certificate issued under paramount federal law. *Mintz* v. *Baldwin,* 289 U. S. 346, upheld the requirement of a state inspection certificate where a federal certificate might have been, but was not, issued. Cf. *California* v. *Thompson,* 313 U. S. 109, 112. Never before, I believe, have we recognized the right of local law to make the use of an unquestionably legal federal license a criminal offense.

What we do today is in disregard of the doctrine long accepted and succinctly stated in the 1851 Term in *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 13 How. 518, 566, "No State law can hinder or obstruct the free use of a license granted under an act of Congress." [4] The confusion and burden arising from the imposition by one

---

[4] *Smith* v. *Maryland,* 18 How. 71, is not to the contrary. There a vessel enrolled under the laws of the United States was allowed to be forfeited by Maryland for dredging for oysters in violation of Maryland law. But the enrollment of vessels serves only a limited purpose. *Smith* v. *Maryland, supra,* was explained in *Stewart & Co.* v. *Rivara,* 274 U. S. 614. The Court said, "The purpose of the enrollment of vessels is to give to them the privileges of American vessels as well as the protection of our flag." *Id.,* at 618. Enrollment without more did not give the enrolled vessel a license to disregard the variety of pilotage, health and other such local laws which the opinion of the Court in the famous case of *Cooley* v. *Board of Port Wardens,* 12 How. 299 (written by Mr. Justice Curtis who also wrote for the Court in *Smith* v. *Maryland*), had left to the States to be obeyed by all vessels. The local regulations approved in the *Cooley* case never qualified the license to ply as a vessel nor penalized its movement on navigable waters. The federal license in the instant case, however, specifically describes the only equipment and fuel which these vessels are allowed to use, and Detroit is permitted to make their use criminal.

State of requirements for equipment which the Federal Government has approved was emphasized in *Kelly* v. *Washington, supra,* in the passage already quoted. The requirements of Detroit may be too lax for another port. Cf. *People* v. *Cunard White Star, Ltd.,* 280 N. Y. 413, 21 N. E. 2d 489. The variety of requirements for equipment which the States may provide in order to meet their air pollution needs underlines the importance of letting the Coast Guard license serve as authority for the vessel to use, in all our ports, the equipment which it certifies.