489 F.2d 334
 TENNECO INC., a corporation, and Texas Eastern Transmission
Corporation, a corportion, Appellants,
v.
PUBLIC SERVICE COMMISSION OF WEST VIRGINIA et al.,
Appellees, NationalAssociation of Regulatory
Commissioners, Intervenor Appellee,
IndependentNatural Gas
Association of
America,
Amicus Curiae.
 No. 73-1294.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 5, 1973.
Decided Dec. 19, 1973.
 
 John O. Kizer, Charleston, W. Va. (David A. Faber, Campbell, Love, Woodrow & Kizer, Charleston, W. Va., on brief) for appellants.
 John E. Lee, Gen. Counsel, Charleston, W. Va. (Marian W. Louis, Asst. Gen. Counsel, and Cassius H. Toon, Charleston, W. Va., on brief) for Public Service Commission of W. Va.
 Sumner J. Katz, Washington, D.C. (Paul Rodgers, Gen. Counsel, and Ray M. Druley, Deputy Asst. Gen. Counsel, Washington, D.C., on brief) for Nat. Ass'n of Regulatory Utility Commrs.
 Jerome J. McGrath and Francis H. Caskin, Washington, D.C., on brief for Independent Natural Gas Ass'n of America.
 Before BUTZNER, FIELD, and WIDENER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 This appeal raises the narrow issue of whether the Natural Gas Pipeline Safety Act of 1968[1] has preempted the field of safety regulation of interstate gas pipelines to the extent that a state, which has qualified as an agent of the Department of Transportation, may not assess fees against the interstate lines to help defray the cost of administering the pipeline safety program. The district judge entered summary judgment upholding the imposition of a state license fee on interstate pipelines crossing West Virginia. Tenneco, Inc. v. Public Service Comm. of West Virginia, 352 F.Supp. 719 (S.D.W.Va. 1973). We affirm.
 
 
 2
 There is no dispute about the facts. Tenneco, Inc., and Texas Eastern Transmission Corp. are engaged in the interstate transportation of natural gas by pipeline through West Virginia. Neither company conducts intrastate business there. Acting under authority of state law, the West Virginia Public Service Commission assessed special license fees in the amount of $2,375.33 and $1,077.44, respectively, against the companies based on the length of their adjusted interstate pipeline mileage.[2] The fees, together with those collected from other interstate and intrastate pipeline companies, were levied for the purpose of paying the expenses of the Commission.[3] On appeal, the companies make no contention that the fees unconstitutionally burden interstate commerce or that they are disproportionate to the state's share of the cost of conducting safety surveillance of their interstate pipelines. Instead, relying on the fact that their transmission facilities are subject to the jurisdiction of the Federal Power Commission, and not to the West Virginia Public Service Commission, the companies contend that the assessments are invalid because the Natural Gas Pipeline Safety Act of 1968 has preempted the field of pipeline safety with respect to interstate transmission facilities.
 
 
 3
 The Natural Gas Pipeline Safety Act of 1968 directed the Secretary of Transportation to establish minimum federal safety standards for the design, installation, inspection, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities used for the transportation of gas. The Act's text,[4] its legislative history,[5] administration implementation,[6] and judicial interpretation,[7] attest to federal preemption of the field of safety with respect to the establishment and enforcement of standards regulating the interstate transmission of gas by pipeline. The constitutional basis of preemption, in this instance, is the commerce clause,[8] and the supremacy clause.[9] In its brief, the Public Service Commission recognizes the restrictions which the Act imposes, and we perceive no intention on the part of the Commission to infringe the federal government's exclusive authority to prescribe the standards necessary for the safe interstate transmission of gas.[10] But federal preemption of the major aspects of interstate gas pipeline safety does not settle the controversy over the power of West Virginia to levy its statutory fee on the pipelines. Preemption of all phases of interstate gas pipeline safety cannot be inferred from the fact that Congress has occupied a part of the field. Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). Federal regulation of an interstate carrier does not preclude state legislation affecting the same carrier unless (1) 'the nature of the regulated subject matter permits no other conclusion,' or (2) 'the Congress has unmistakably so ordained.' Florida Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).
 
 
 4
 The first test of preemption-- whether the nature of the regulated subject matter permits no other conclusion but preemption-- depends primarily on whether the state law under scrutiny obstructs the Congressional objectives. See Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The facts of this case demonstrate that West Virginia's pipeline assessment law fosters state-federal cooperation. Confessing to a lack of staff,[11] the federal government invited the states to act as agents of the Secretary of Transportation for the purpose of maintaining surveillance over the interstate pipelines, to assure compliance with federal regulations.[12] More than a score of states, including West Virginia, accepted this responsibility.[13] The complementary roles of the state and federal governments under the Act provide an opportunity for partnership that has been described as 'unprecedented in federal utility regulation.'[14] Thus, it is apparent that, instead of preempting every feature of interstate gas pipeline safety, the federal government has invited the states to participate in the program by voluntarily undertaking the indispensable task of inspection. The states, of course, must obtain funds to pay for this work. The West Virginia legislature chose as a matter of state policy to defray her costs by imposing license fees measured by adjusted pipeline mileage.[15]
 
 
 5
 This record contains no proof that West Virginia's levy unduly burdens interstate commerce, that it is discriminatory, that it is disproportionate to the state's cost of participating in the safety program, or that it in any way prevents the companies from complying with the 1968 Act. Indeed, it is undisputed that the fees pay part of the cost of the surveillance that is designed to promote compliance with the federal standards. Thus, West Virginia's method of financing its participation in the gas safety program does not obstruct or impair accomplishment of the congressional objective embodied in the Act-- the safe interstate transmission of gas. We conclude, therefore, that West Virginia's license fees are not invalidated by the first test of preemption.
 
 
 6
 We turn to the second test of preemption: has Congress unmistakably ordained that the states are barred from taxing interstate pipelines to help defray the cost of inspection? The companies urge that a 1972 amendment to the Act requires an affirmative answer to this question. The 1968 Act made no provision for reimbursing the states for the expenses they incurred as agents of the Secretary of Transportation. A number of states protested this omission and urged the enactment of legislation to correct it. In 1971, the National Association of Regulatory Utility Commissioners proposed that the states be awarded grants-in-aid to cover up to 50 per cent of their expenses, and that the states' regulatory commissions be authorized to assess interstate pipelines to defray the costs of the states' share of the safety program that was not available from other sources.[16] Congress, however, did not adopt this solution to the problem. It provided grants-in-aid to the states of up to 50 per cent of their costs of participation in the interstate safety program,[17] but it did not authorize state utility commissions to assess pipelines.[18]
 
 
 7
 We find in the 1972 amendment and in its legislative history no unmistakable congressional intention to bar states from assessing pipelines to pay the remaining 50 per cent of the states' expenses. The fact that Congress chose not to enact legislation that would authorize state regulatory commissions to assess interstate pipelines under federal law does not establish that Congress intended to prohibit such assessments under state law. To the contrary, the legislative history of the 1972 amendment indicates that Congress was willing to allow the states to select the most feasible means of financing the balance of their costs in light of their own tax structures and budgetary requirements. The Senate Report on the 1972 amendment discloses that Congress was aware that federal officials were administering the Act on the assumption that the states were not inhibited from assessing interstate pipelines to defray the expense of conducting safety surveillance as agents of the Secretary.[19] With this information before it, Congress placed no limitation in the 1972 amendment on the power of the states to continue this method of funding their costs.
 
 
 8
 Finally, the companies argue that the Secretary has not delegated to the states that are acting as his agents authority to levy fees against interstate pipelines. This argument, based on a literal application of the law of agency, misconceives the source of the states' taxing power. Concededly, the Secretary cannot authorize states to impose a tax on pipelines, but states possess inherent power to tax that can be exercised in the absence of constitutional prohibition or congressional preemption. Braniff Airways v. Nebraska State Board, 347 U.S. 590, 597, 74 S.Ct. 757, 98 L.Ed. 967 (1954). Here the companies do not invoke the Constitution, and the Secretary, acting through the Office of Pipeline Safety, recognizes that the Act does not preempt the states' taxing power over interstate pipelines. Initially, the officials administering the Act expressed the opinion that states were not authorized to assess fees against interstate pipelines. However, recognizing that this stand was an impediment to cooperation between state and federal governments, that Office of Pipeline Safety changed its position. It now acknowledges that, considering the overall objectives of the Act, there is no 'basis for implying an intent on the part of Congress to preempt the authority of States to tax, assess, or impose fees on interstate operators.'[20] This administrative interpretation, while not controlling, is entitled to great weight. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). We, therefore, conclude that West Virginia's license fee survives the second test preemption.
 
 
 9
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Title 49 U.S.C. 1671-1684 (1970)
 
 
 [2]
 West Virginia Code Ann. 24B-5-3(a) (1971) provides:
 '(a) Every pipeline company shall pay a special license fee in addition to those now required by law. The amount of such fees shall be fixed by the public service commission and levied by it upon each of such pipeline companies according to the number of three inch equivalent pipeline miles included in its pipeline facilites, and shall be apportioned among such pipeline companies upon the basis of the pipeline companies' reports submitted to the commission in such form as the commission may prescribe, so as to produce a revenue of not more than ninety thousand dollars per annum, which fees shall be paid on or before the first day of July in each year.'
 
 
 [3]
 West Virginia Code Ann. 24B-5-3(b) (1971) provides in part:
 '(b) Such sums collected under . . . subsection (a) of this section shall be paid into the state treasury and kept as a special fund, designated 'public service commission gas pipeline safety fund,' to be appropriated as provided by law for the purposes of paying the salaries of the commission, as fixed by this chapter, its expenses and salaries, compensation, costs and expenses of its employees. Any balance in said fund at the end of any fiscal year shall not revert to the treasury, but shall remain in said fund and may be appropriated as provided in this subsection.'
 
 
 [4]
 Title 49 U.S.C. 1672(b) provides for the establishment of minimum federal safety standards for the transportation of gas. The section concludes:
 'Any State agency . . . may not adopt or continue in force after the minimum Federal safety standards referred to in this subsection become effective any such standard applicable to interstate transmission facilities.'
 
 
 [5]
 'The relationship of Federal-State regulatory authority created by this bill differs as between local pipelines and interstate transmission lines. In the latter area, the lines of a single transmission company may traverse a number of States and uniformity of regulation is a desirable objective. For this reason, section 3 provides for a Federal preemption in the case of interstate transmission lines.' H.R.Rep.No.1390, 90th Cong., 2d Sess. (1968); 3 U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. pp. 3223, 3241 (1968)
 
 
 [6]
 In 1973, the Secretary of Transportation reported to Congress that the Department of Transportation through its Office of Pipeline Safety exercised exclusive authority for safety regulation of interstate gas transmission lines. See Federal-State Relations in Gas Pipeline Safety 3, 7, 10 (1973)
 
 
 [7]
 'The 'Natural Gas Pipeline Safety Act of 1968' . . . has entered the field of 'design, installation, inspection, testing, construction, extension, operation, replacement and maintenance of pipeline facilities.' . . . As applied to interstate transmission pipelines, the Safety Act must prevail over and pre-empt any state (law).' United Gas Pipeline Co. v. Terrebonne Parish Police Jury, 319 F.Supp. 1138, 1139 (E.D.La. (1970), aff'd 445 F.2d 301 (5th Cir. 1971)
 8 U.S.Const., art. I, 8.
 9 U.S.Const., art VI.
 
 
 [10]
 West Virginia's Gas Pipeline Safety Act was carefully drafted to avoid infringing on federal regulatory power. W.Va.Code Ann. 24B-2-1 (1971) provides in part:
 'The commission shall have power and authority to prescribe and enforce safety standards for pipeline facilities, and to regulate safety practices of persons engaged in the transportation of gas, to the extent permitted by the (Natural Gas Pipeline Safety) 'Act of 1968' and any amendments thereto.'
 
 
 [11]
 In 1971, the Office of Pipeline Safety had only two full time employees to enforce compliance with federal standards. S.Rep.No.92-829, 92d Cong., 2d Sess. (1972); 2 U.S.Code Cong. & Admin.News, 92d Cong., 2d Sess., pp. 3049, 3050 (1972). This lack of personnel has persisted. Federal-State Relations in Gas Pipeline Safety 9 (1973)
 
 
 [12]
 49 C.F.R. 190.6(a) provides in part:
 '(a) Any State agency of any State having authority, under the laws of that State, to exercise safety jurisdiction over interstate transmission facilities and that desires to exercise that authority as an agent of the Secretary of Transportation, is hereby authorized to do so.'
 The scope of the states' authority is explained in 35 Fed.Reg. 13249-50 (1970) quoted in Federal-State Relations in Gas Pipeline Safety 10 (1973):
 'The agency authority with respect to interstate pipelines authorizes the State to maintain surveillance over the operation to insure compliance with Federal regulations. State personnel should perform the same function that Federal field personnel perform, inspecting operations and giving informal opinions and approvals as to compliance with the regulations.
 'The agency authority does not create enforcement authority in the State. Enforcement actions, except those which the operator voluntarily accepts, will be taken at the Federal level.
 'The agency authority does not authorize a State to create new standards or to take any action which would substantively change the Federal standards. The Act requires that standards be prescribed by the Department in accordance with applicable rulemaking procedures.'
 
 
 [13]
 Federal-State Relations in Gas Pipeline Safety 28 (1973)
 
 
 [14]
 Federal-State Relations in Gas Pipeline Safety 3 (1973)
 
 
 [15]
 See note 2, supra
 
 
 [16]
 See S.Rep.No.92-829, 92d Cong., 2d Sess. (1972); 2 U.S.Code Cong. & Admin.News, 92d Cong., 2d Sess. pp. 3049, 3052 (1972)
 
 
 [17]
 Title 49 U.S.C.A. 1674(c) (Supp.1973), Act of August 22, 1972, Pub.L.No.92-401, 2, 86 Stat. 616
 
 
 [18]
 The Committee on Commerce found this proposal and others submitted by the National Association of Regulatory Utility Commissioners to be worthy of consideration, but it deferred action because of the delay that major changes in the Act would cause. S.Rep.92-829, 92d Cong., 2d Sess. (1972); 2 U.S.Code Cong. & Admin.News, 92d Cong., 2d Sess., pp. 3049, 3055 (1972)
 
 
 [19]
 '(The National Association of Regulatory Commissioners) criticized . . . interference by the Office of Pipeline Safety in State efforts to fund safety inspections of interstate pipelines through assessment of those lines . . . The Office of Pipeline Safety has subsequently changed its position on the assessment issue, now interpreting the Act not to address State power to assess interstate pipelines . . ..' S.Rep.No.92-829, 92d Cong., 2d Sess. (1972); 2 U.S.Code Cong. & Admin.News, 92d Cong., 2d Sess. pp. 3049, 3052 (1972)
 
 
 [20]
 Letter from Joseph C. Caldwell, Acting Director, Office of Pipeline Safety, to Paul Rogers, General Counsel, National Association of Regulatory Utility Commissioners, February 17, 1972; see also, note 19, supra
 After reiterating that the Secretary could not delegate authority to a state commission to assess fees against interstate pipelines, the Acting Director wrote in his letter of February 17, 1972:
 'The second question was whether or not the Act either expressly or impliedly prohibits a State from assessing fees against interstate operators. Upon review of this question and a thorough analysis of the statutory language and legislative history of the Act, the Department's General Counsel determined that the expressed preemption in Section 3 relates only to the establishment of safety standards and State actions necessarily associated with the establishment of safety standards. He concluded that this express preemption did not extend to other State activities such as taxation or assessments. He further indicated that considering the overall objectives of the Act, there was no basis for implying an intent on the part of Congress to preempt the authority of States to tax, assess, or impose fees on interstate state operators. Based upon this interpretation, it is the Department's position that in adopting the Act Congress did not either expressly or impliedly preempt the power of the States to raise funds.
 'The General Counsel did note that there may be other legal bases upon which State statutes could be found invalid, such as, for example, imposition of an unreasonable burden on interstate commerce or discriminatory taxation. However, these are not matters which hinge on his interpretation of the Act.'