June 10, 1977

## 77-36 MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL, FEDERAL ENERGY ADMINISTRATION

### State Jurisdiction to Regulate Pollutant Emissions

This is in reply to your letter concerning the proposed oil tanker terminal that a major oil company seeks to operate at Long Beach, Calif. A major question that has arisen in a California Air Resources Board administrative proceeding, is whether the State would have "jurisdiction and authority to regulate pollutant emissions from oil tankers using the proposed terminal, while such tankers are operating beyond the 3-mile territorial limit of the State but are . . . within the South Coast Air Basin . . . [that is, within an area extending up to 12 miles from shore]."

1. Introduction and Summary

Preliminarily, it is necessary to distinguish between (1) the general question of the extent of California's authority or jurisdiction over tankers using the proposed terminal, and (2) the question of the validity of particular emission-control requirements which the State might seek to impose. We shall consider the former, but not the latter.[1] Our views may be summarized as follows: Regarding operations in the contiguous zone (i.e., the area extending up to 12 miles from the shore) of ships using the proposed terminal, California would have some authority to prescribe and enforce air pollution controls. However, the State's authority would not be unlimited. The validity of a particular requirement or enforcement action would depend upon several factors. One requirement is that there be a sufficient connection between the regulated activity and air quality within the State's geographic limits. Other pertinent factors include feasibility and practical consequences (e.g., cost), the relationship to Federal standards (e.g., safety standards promulgated by the Coast Guard), and, in particular, action taken by the

---

[1] Our discussion does touch upon certain of the conditions proposed by the oil company, but we do not attempt to assess their validity. Issues concerning the various means of enforcing the pollution-control requirements are also significant, but we do not discuss them.

U.S. Environmental Protection Agency (EPA) regarding the proposed terminal.

## 2. Factual Background

The main purpose of the proposed terminal would be to accommodate tankers transporting crude oil from the North Slope of Alaska. The bulk of the oil received at the terminal would then be sent, via pipeline systems, to refineries in the Midwest and on the Gulf Coast.

The Los Angeles-Long Beach area, where the terminal would be built, has severe air pollution problems. Before the project can proceed, it must be approved by State environmental authorities and by EPA.

Now pending before the California Air Resources Board is the oil company's request for a construction permit. This proceeding is based upon State law. To date, EPA has not approved California's procedures for review, under the Clean Air Act, of new stationary sources of emissions. Such approval may be granted in the future, but, if it is not, the oil company's ability to go forward will depend upon issuance of a permit by EPA,[2] as well as a State permit. Issuance of a permit by EPA will not occur until after issuance of a permit by the State; it is possible that the terms and conditions of the EPA permit would simply follow those of the State permit.

In connection with the proceeding before the State agency, the oil company has proposed a set of conditions to deal with the problem of air pollution from the tankers. Some of the conditions pertain to vessel design or equipment, e.g., ballast capacity (§ 1) and inert gas systems (§ 4). Others relate solely to tanker operations occurring within the port, e.g., unloading procedures (§§ 3, 6). A third category consists of conditions which apply to operations occurring not only within the 3-mile limit but also within an area extending as much as 12 miles from the coast, e.g., ballasting operations (§ 1), prohibition on expulsion of hydrocarbon vapors (§ 2), and use of low sulfur fuel (§ 7).

The California authorities are reluctant to agree to the permit conditions proposed by the oil company unless the State is assured that it would have authority to enforce them with respect to activities beyond the 3-mile limit. Presumably, the State's concern relates only to the third category of conditions. The terminal will be within the territory of California so the extraterritorial issue is not raised by the rules concerning unloading or other activities at the terminal itself. In addition, to the extent that the rules involve vessel characteristics or equipment (as opposed to operations), the extraterritorial question appears to be irrelevant.

## 3. Discussion

There are several types of conditions that may raise certain legal questions. For example, one of the conditions would require that the

---

[2] For the EPA regulation concerning the granting of such permits in California, see 40 CFR 52.233.

tankers have ballast capacity of a certain type (§ 1); another would require the vessels to have an inert gas system or comparable equipment (§ 4). Each of these matters is now addressed in Coast Guard regulations. [3] Clearly, the issues of preemption and burdens on commerce apply generally to the proposed conditions.

Another point that should be mentioned is that pertinent laws are in a process of change. Amendments to the Clean Air Act are now being considered in Congress. [4]

In March, President Carter sent to Congress a message concerning oil pollution of the oceans. 13 Weekly Compilation of Presidential Documents 408 (1977). He pointed out that he had directed the Secretary of Transportation to develop new regulations concerning oil tanker standards, including the matters of segregated ballast and inert gas systems. Proposed rules to this effect have been published in the Federal Register. [5]

Another pertinent bill, S. 682, the Tanker and Vessel Safety Act, was recently passed by the Senate. See 123 Cong. Rec. S. 8823 (daily ed., May 27, 1977). The bill deals, in part, with design and operating standards for all tankers entering U.S. ports. Probable jurisdiction was noted in *Ray v. Atlantic Richfield Co.,* 95 S. Ct. 1172 (1977), a case now pending before the Supreme Court, which involves the preemptive effect of the Ports and Waterways Safety Act. Relevant changes in international law may result from the Law of the Sea Conference.

The developments mentioned above are pertinent because their outcome may affect California's authority to regulate tanker operations.

The subjects we have addressed are solely issues of Federal law. We did not look into questions of California law, e.g., the extent of the authority of the State regulatory bodies, or into the possible significance of contract or real estate law (i.e., reliance on conditions set forth by the Port of Long Beach in its lease with the company, in addition to use of the State's police power).

Although we did not give separate attention to the existence of Federal authority to regulate the tanker operations in question, it is important to note that certain possible Federal limits upon the State's authority—for example, preemption—have no application to the Federal Government. A related matter that could become significant is the possibility of State enforcement of federally prescribed pollution control requirements. See, e.g., § 304 of the Clean Air Act, as amended, 42

[3] *See* 46 CFR 32.53 (inert gas system); 33 CFR 157.09 (segregated ballast). *See also* proposed amendments to the Coast Guard regulations set forth in 42 Fed. Reg. 24868 (segregated ballast) and 24874 (inert gas system).

[4] Recently, an amendment bearing directly upon the present issues was introduced in the House of Representatives, debated, and then withdrawn. *See* 123 Cong. Rec. H 5067–72 (daily ed., May 25, 1977). The sponsor stated that a similar amendment might be offered in the future. 123 Cong. Rec. H 5072 (daily ed., May 25, 1977) (Remarks of Representative Miller).

[5] See footnote 3, *supra.*

143

U.S.C. 1857h–2, which authorizes the bringing of certain types of "citizen suits."

### a. Preemption

#### (1) The Clean Air Act

One question is whether the Clean Air Act furnishes a basis for regulating emissions from vessels. Your Office and EPA have taken the position that it does, and we agree. *See, Texas* v. *EPA,* 499 F. 2d 289, 316–317 (5th Cir. 1974).

Under the Clean Air Act, EPA sets national ambient air quality standards for widespread pollutants, such as hydrocarbons. § 109, 42 U.S.C. 1857c–4. The basic means of achieving compliance with standards is a State implementation plan. § 110, 42 U.S.C. 1857c–5. The Act expressly provides that "primary responsibility for assuring air quality within . . . [its] geographic area" belongs to each State. § 107, 42 U.S.C. 1857c–2. If a State plan is inadequate in some respects, EPA is required to cure the deficiency by issuing its own regulation. As noted previously, EPA has not approved California's procedure for review of new sources and has promulgated a regulation providing for review by EPA.

It is clear that, with limited exceptions not pertinent here, the Clean Air Act does not preempt State authority, *i.e.,* use of the State's police power to impose standards regarding air pollution. The Act contains a provision, § 116, 42 U.S.C. 1957d–1 (1975 Supp.), which provides that there is no such preemption, so long as the standard based upon State law is not less stringent than standards set forth in the Act.

According to your memorandum, EPA has stated that the conditions proposed by the oil company are not less stringent than standards EPA would impose in connection with its review of the terminal. Of course, the action ultimately taken by EPA will be highly significant. One possibility would be that, after issuance of a permit by the California agency, EPA would issue a permit setting forth the same conditions. Such action by EPA would lend substantial support to the action taken by the State agency. On the other hand, a finding by EPA that one or more of the State's conditions would not be sufficiently strict would probably mean that any such condition would be revised.

#### (2) Ports and Waterways Safety Act

Title I of the Ports and Waterways Safety Act of 1972 (PWSA) authorizes the Coast Guard to establish vessel traffic control systems and to regulate certain types of vessel operations, in order to prevent damage to vessels, bridges, and other structures and to protect the navigable waters from environmental harm. 33 U.S.C 1221 (1975 Supp.). More pertinent here is Title II, 46 U.S.C. 391a (1975 Supp.), which directs the Coast Guard to establish regulations concerning the design and operations of certain kinds of vessels, including oil tankers, in order to protect the navigable waters of the United States and the

resources of those waters and adjoining land. Such regulations have been issued. *See* 33 CFR 157.

The District Court in *Atlantic Richfield Co.* v. *Evans,* a case now pending in the Supreme Court,[6] held that the PWSA preempted the field so as to render invalid Washington statutes regulating the size and design of oil tankers operating in Puget Sound. We believe that even assuming the District Court correctly decided the *Atlantic Richfield* case, the facts differ significantly from the present situation.

Here, if a California permit containing the oil company's conditions is ratified by EPA, the issue will not be preemption by the PWSA, but the relationship between that statute and the Clean Air Act. *Cf., Texas* v. *EPA, supra.* In the event of conflict or inconsistency between the California (or EPA) conditions and Coast Guard regulations, the result will depend upon the specific facts. The task will be to reconcile the two statutes, bearing in mind that a basic objective of the Clean Air Act is to preserve the primary role of the States with respect to control of air pollution. *Cf., Huron Portland Cement Co.* v. *Detroit,* 362 U.S. 440 (1960).

To summarize, it does not appear that the subject in question—controlling air pollution caused by oil tankers—is preempted by the PWSA or any other Federal law.[7] Still, depending upon the particular facts, the PWSA or Coast Guard regulations issued under it might have the effect of overriding certain requirements imposed by California.

### b. Burden on Commerce; Foreign Relations

The *Huron Portland Cement Co., supra,* case and others that deal with the question whether State laws impose an unconstitutional burden on interstate commerce support the view that the proposed California standards would not be invalid on this ground. However, depending upon the factual record, certain of the requirements might be vulnerable. Congress has indicated its view that, with regard to control of air pollution, variation from State to State is permissible. Even if the California standards were to impose requirements going beyond Coast Guard regulations and entailing substantial expense (*e.g.,* additional equipment or changes in the vessels), California could assert that the seriousness of its air pollution problem justifies the measures it has adopted.

The next matter to be discussed is the possible impairment of the foreign relations of the United States, resulting from the application of the California standards to foreign ships. In this regard, the decision in *Zschernig* v. *Miller,* 389 U.S. 429 (1968) should not be given much weight. That case involved an Oregon statute relating to the ability of

---

[6] The decision of the District Court, No. C-75-648-M (W.D. Wash. Sept. 23, 1976), is not reported.

[7] A number of other statutes deal with aspect of oil tanker operations. *See, e.g.,* the Oil Pollution Act, 33 U.S.C. 1002. There are also international conventions relating to the subject, *e.g.,* the International Convention for the Safety of Life at Sea, 16 U.S.T. 185.

nonresident aliens to inherit Oregon property; its provisions were such that the State courts passed judgment upon the laws and practices of the foreign country and the credibility of foreign officials. It was this kind of inquiry that caused the Supreme Court to find an unconstitutional intrusion by the State into the realm of foreign affairs. Here, in contrast, the question would be one of applying to foreign ships State regulations of general applicability. No question of discrimination against foreign ships would be presented.

In general, the police power of a State extends to foreign persons within its jurisdiction.[8] *See* concurring opinion of Mr. Justice Harlan in *Zschernig,* 389 U.S. at 459. An added factor here is that the California requirements might have the imprimatur of EPA. Thus, we question whether the *Zschernig* issue indicates the need for exemption or special treatment of foreign ships.

### c. Operations Outside the 3-Mile Limit

It is our opinion that with respect to tankers using the proposed terminal, California has authority to regulate operations taking place beyond the 3-mile limit. This assumes, of course, that there is a proper nexus between those operations and the quality of the air over the State's territory.

It is significant that the proposed conditions are limited to ships using the terminal; the State does not seek to regulate all vessels coming within the contiguous zone.

It seems clear that Congress has the power to reach conduct occurring in the contiguous zone, but one issue is whether the Clean Air Act was intended to have that effect. A general rule of statutory construction is that "the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears." *Steele* v. *Bulova Watch Co.,* 344 U.S. 280, 285 (1952).

The view that the Clean Air Act has extraterritorial effect (at least to the extent involved here) rests upon the purpose of the statute, rather than any specific provision or legislative history. Your Office and EPA have concluded that the Act does have that effect. We are in accord with your view. Because the purpose of the State's requirements concerning operations in the 12-mile zone would be to protect the air over the State's territory, not the air over the high seas. This would seem to be a reasonable means of implementing the Act.[9]

In addition, as pointed out above, the States retain the authority to exercise independent police power to deal with air pollution. If the requisite nexus exists, that authority could be used to reach conduct in

---

[8] Another pertinent consideration may be whether a foreign-flag ship is owned or controlled by United States persons. *Cf., Lauritzen* v. *Larsen,* 345 U.S. 571 (1953).

[9] Clearly, the present situation differs from one in which State A sought to regulate, on the basis of the Clean Air Act, activities in State B. *But see, Illinois* .v. *City of Milwaukee,* 406 U.S. 91, 103–108 (1972) (water pollution suit based on Federal common law of nuisance).

the contiguous zone. *Cf., Skiriotes* v. *Florida,* 313 U.S. 69, 77 (1941). This is another area where the issue of jurisdiction over foreign ships is raised. In our opinion, California possesses some regulatory authority over such ships.

The Federal Government may impose reasonable conditions upon foreign ships using its ports. *Cf., Cunard Steamship Co.* v. *Mellon,* 262 U.S. 100, 124 (1923) (application of prohibition law). Such conditions may relate to conduct beyond the 3-mile limit.

For purposes of international law, the authority to impose such conditions may be exercised not only by the Federal Government, but also by a State government. Therefore, assuming there is no conflict with an applicable treaty (or Federal statute or regulation), California would have authority to regulate foreign ships, as well as United States ships, using the proposed terminal.

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*